RICHARD R. SYLVESTER AND HELEN E. SYLVESTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sylvester v. Comm'r
Docket No. 2707-77. United States Tax Court
T.C. Memo 1978-461; 1978 Tax Ct. Memo LEXIS 53; 37 T.C.M. (CCH) 1847-79; November 20, 1978, Filed *53 Petitioner claimed deductions for certain gifts made to charities, and for certain casualty losses, for his taxable year ended December 31, 1973. Held: amount of allowable charitable and casualty loss deductions determined. Richard R. Sylvester, pro se. William J. Salica, for respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined a deficiency in Petitioners' income tax for their taxable year 1973 in the amount of $2,466.69. This action concerns certain casualty loss and charitable gift deductions, claimed by petitioners for that taxable year and disallowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, Richard R. Sylvester and Helen E. Sylvester, husband and wife, resided in Los Angeles, California at the time they filed their petition herein. Petitioners' 1973 income tax return was timely filed with the internal revenue service at Fresno, California. At all times relevant herein, petitioners used the calendar year as their tax accounting period and apparently were *54 on a cash basis of accounting. Helen E. Sylvester is a party to this action solely by reason of filing a joint return with her husband for their 1973 taxable year. Therefore, hereafter "petitioner" will refer to Richard.
On his 1973 income tax return, petitioner reported income from wages totaling $26,215.60. Attached to his return were two Forms W-2 showing gross income from wages of $9,636 from the state of California as wages for teaching, and $16,579.60 from Celesco Industries, Inc. Not attached to the return, but included on page 165 of petitioner's exhibit number 2 is a Form 1099-MISC, Statement for Recipients of Miscellaneous Income, showing "Commissions and fees to nonemployees" in the amount of $6,327 from the Northrop Institute of Technology (Northrop). Petitioner reported this amount, along with an additional $2,208.26 from other sources, as management consulting gross income on an attachment to schedule C of his Form 1040. This management consulting gross income was reported on line 12 of petitioner's Form 1040 as a loss. The origin of all of petitioner's reported sole proprietorship expenses, which totaled $8,827.43 in 1973, is not clear from the record. From a reported *55 adjusted gross income of $25,251.14, petitioner took $21,944.56 in deductions from income. Of this amount, respondent disallowed $12,691.86. This $12,691.86 figure may be comminuted as follows: CHART I
Deduction
Incident giving
Item
rise to deduction
Code Sec.
Claimed
Allowed
Adjustment
1
Brentwood house,
165(c)(3)
$ 2,838.36 $ 200.00
$ 2,638.36
rainstorm damage
2
1966 Lincoln
165(c)(3)
686.50
0
686.50
collision
3
Theft loss-tools
165(c)(3)
260.00
150.00
110.00
Subtotal
3,784.86
350.00
3,434.86
4
Gift of 113 documents
170(a)
8,977.00
1,600.00
7,377.00
to Northrop
5
Gifts to Goodwill
170(a)
1,168.00
203.00
1,880.00
6
Gifts to Salvation
170(a)
915.00
Army
7
Cash gifts to charity
170(a)
77.00
77.00
0
8
Cash gifts to church
170(a)
520.00
520.00
0
Subtotal
11,657.00
2,400.00
9,257.00
TOTAL
$ 15,441.86
$ 2,750.00
$ 12,691.86 There was no attempt, by respondent in his explanation of adjustments attached to his notice of deficiency, or by the parties in their stipulations, to explain more precisely than is shown above, which part of which claimed section 170(a), I.R.C. 1954, deduction was being disallowed. The major item in dispute relates to the gift to Northrop of 113 documents for which petitioner deducted $8,977. Of this amount $5,085 was attributed *56 by petitioner to the value of a photocopy of a book manuscript (manuscript) which he had written. To this amount was added: (1) $2,000 representing petitioner's estimate of the value to some other researcher of the time that researcher might save due to using the petitioner's manuscript as a reference and source material and (2) $300 as a "cost of obtaining documents." Thus the total deduction attributable to the photocopy of the manuscript was $7,385. The rest of the $8,977 worth of claimed deductions, or $1,592 [1] was attributed by petitioner to the other 112 documents donated to Northrop. The gift of the manuscript carried with it none of the rights of ownership of the contents of the manuscript--such as publishing or copyright rights, but was a gift of a mere photocopy of petitioner's prospective book. All rights of exploitation remained with petitioner. The manuscript was written pursuant to a contract with the Ronald Press Co. of New York City (Ronald). The publishing contract, dated October 30, 1971, provided that petitioner would write the *57 manuscript and assign all his rights, including copyrights, therein to Ronald in consideration of $5,000 to be paid to petitioner in three installments, and 15 percent of the catalog list price for each volume of the published work sold. Petitioner was paid the first $1,500 of this $5,000 amount, but received no further payments from Ronald under the contract. Petitioner recovered an additional $500 from Ronald in 1973--apparently in a settlement in which each party released all his claims against the other (this $500 was included by petitioner in income as gross management consulting income). Petitioner estimates that he could make $97,500 over the course of 5 years from the manuscript, assuming (1) it was published, (2) 13,000 books were sold each year, and (3) petitioner was paid 15 percent of an estimated $10 sales price per book. The manuscript was also listed as an asset being retained by petitioner in his marriage settlement agreement signed May 13, 1975 in connection with his divorce. The manuscript was there ascribed a value of $5,000.At trial petitioner's expert witness estimated the manuscript's value to be $10,000. When told that the gift was of a mere photocopy *58 of the manuscript which did not include any publishing or copyright privileges thereto, the expert revised his opinion downward 50 percent and gave the manuscript a value of $5,000. This $5,000 value was based on the manuscript's value as a "timesaving device" for other researchers.However, the expert conditioned this $5,000 valuation, saying "I would hope that a buyer for $5,000.00 without a copyright would get [the author] to agree not to stop [the buyer] from securing a copyright on a revised version of [the author's] work." It was petitioner's practice to deduct currently the expenses associated with the production of the manuscript.While petitioner was writing the manuscript, he deducted at least $2,590 as current expenses under section 162 or 212.During this time petitioner also received the $2,000 in payments, mentioned above, from Ronald for his work on the manuscript. From all the evidence, we find that petitioner has failed to show that he had other than a zero basis in the manuscript at the time petitioner donated a photocopy thereof to Northrop. Respondent stipulated with petitioner, in a document filed with the Court the same day as the hearing held herein, that he was *59 allowing $1,600 of the claimed deduction for the donations to Northrop. None of the $5,085 claimed for the gift of the manuscript was allowed. No part of the $2,000 claimed as the value of the manuscript to other researchers, or the $300 claimed as a "cost of obtaining documents", was allowed. [2] Apparently, respondent did not contest the deductibility of items 7 and 8 of Chart I above, totaling $597. The items donated by petitioner to Goodwill and the Salvation Army in 1973 were shown by petitioner in two lists attached to his return for that year. The lists are reproduced in margin as "Chart II". [3] The "current value" figure shown thereon for each item is the amount deducted by petitioner for the gift of such item on his 1973 return, and represents petitioner's estimation of each item's value as of the date of its donation. Petitioner produced at trial no credible evidence as to the actual donation-date fair market value of any of such items. In his stipulation of facts with petitioner, respondent stipulated that he was allowing petitioner a total section 170 deduction of *60 $203 for all the listed items. Petitioner also claimed a series of casualty losses on his 1973 return. The largest of these was a claimed section 165(c)(3) deduction of $2,838.36 for rain and mudslide damage to his home. Petitioner derived this figure by adding together the expenses he incurred, or believed *61 he would incur, in repairing the storm damage. Petitioner's own explanation of these expenses is set out below as "Chart III". CHART III
(1) Damage to house interior and landslide repair due to rainstorm 1/73. Damage estimated by both repair cost and decrease in fair market value. $ 2,938.36 [4]
100.00 [5]
$ 2,838.36 Casualty loss due to rainstorm
Itemized list of damage: $ 66.78 Fabric--water damage on bedspread due to flooding
water
39.83 Plumbing--broken connections from earth movement
182.06 Title--replacement of cracked title due to house
movement
466.16 Rug--water damage due to flooding water
225.59 Plants--replacements of plants unearthed by earth
movement
57.49 Retaining wall--replacement of earth retaining wall
105.45 Other--small tools, supplies related to repair work
1,800.00 Labor--estimated cost to repair landslide
150 hours at $ 12/hr, for area approx.
50 feet X 23.8 X 10 feet (11,907 cu. ft./27= 441 cu.yds.)
backfill and compaction, hand cost is
$ 5.83/yd. 1975 assume $ 4.08/yd 1973
441 X $ 4.08 = $ 1,800.00
Petitioner supported these figures by introducing into evidence eleven checks *62 (and one receipt) totaling $605.53. These checks and receipt are summarized below: CHART IV
Item
Check Date
Check No.
Check Amount
Payees
1
May 5, 1973
939 $ 31.98
S & M Nursery
2
May 6, 1973
339
5.35
S & M Nursery
3
June 3, 1973
983
11.00
S & M Nursery
4
July 27, 1973
1056
57.47
Sawtelle Lumber Co.
5
Aug. 8, 1973
1052
26.37
Sears
6
Aug. 11, 1973
1044
50.21
S & M Nursery
7
Sept. 4, 1973
711
316.16
Harry P. Hirsch Carpet Co., Inc.
8
Sept. 7, 1973
471
41.30
S & M Nursery
9
Sept. 8, 1973
469
11.15
S & M Nursery
10
Oct. 4, 1973
757
20.62
Kerm Rima Hardware
11
Nov. 4, 1973
739
20.32
S & M Nursery
Subtotal $ 591.93
12
Feb. 7, 1973
Receipt
13.60
Mullins Pipe & Supply
TOTAL $ 605.53
The rainstorm and resulting damage occurred sometime in January or February, 1973. Petitioner had still not repaired the damage to his land, i.e., the damage to the 78earth buttresses", etc., around his house--for which a quoted estimated cost of $1,800 in labor was deducted for petitioner's taxable year 1973 (see Chart III above)--as of February 1974 when petitioner received an "Order to Comply" from the Department of Building and Safety of the City of Los Angeles ordering him to repair his "land failure". While petitioner claimed $39.83 as a cost of plumbing repairs due *63 to the storm, petitioner included in evidence only a receipt for $13.60 indicating his purchase of pipe, which was dated 2/7/73.
There was no credible evidence introduced with respect to the amount or existence of the roof tile or "other" expenses listed on Chart III above. Petitioner testified with respect to the loss of a bedspread--which he said had cost him $66.78--but for which he introduced no evidence establishing its fair market value on the date of loss. Petitioner also testified that he had to replace his kitchen rug due to flood damage at a cost of $446.16. Petitioner's records corroborate this inasmuch as the check for $316.16 listed as item 7 in Chart IV above was the final payment for a $446.16 purchase. Petitioner testified that he actually expended the $57.49 claimed for replacement of the retaining wall as shown in Chart III. Finally, the evidence shows, and we find, that petitioner spent $171.31 at S & M Nursery in 1973. Petitioner's estimate of the decrease in fair market value of his house also equaled $2,938.36, [6] i.e., the exact amount of petitioner's estimated repair costs. Petitioner's estimate of the house's adjusted basis in 1973 was $29,493. The storm *64 damage was not covered by insurance. The next casualty loss claimed by petitioner was $686.50 for collision damage to his 1966 Lincoln Coupe. Petitioner had purchased the car used for $2,750 on October 25, 1968. Over the course of the years that petitioner owned the car he spent at least $3,909.67 for repairs and maintenance. The car had 104,152 miles on it on December 31, 1973. It is unclear from the evidence whether the accident occurred in January or August of 1973.On November 29, 1973 petitioner recovered $306.50 in an action for damages to his car in the Small Claims Court for the Los Angeles Judicial District. Petitioner did not perform any repairs on the car until October 25, 1973, when he spent $40 to have a fender straightened. Petitioner used the car throughout 1973, and until he sold it for $175 in early 1974. Two pages from the "Kelley Blue Book", an automobile valuation booklet published bimonthly, for the period November-December 1973 were introduced into evidence. One of these pages showed that in November and December *65 of 1973 the Kelley Blue Book value of a 1966 Lincoln was $450 (wholesale) and $700 (retail)--both of which figures would be adjusted for low or high mileage. Petitioner estimated the value of his car at the time of collision to be $1,275 based on (1) the car's excellent condition, and (2) the fact that the car was somewhat of a collector's item because it was an example of the first year in which Lincoln Continental coupes were sold. Since petitioner sold the car for $175 in early 1974, he figured his loss to be $1,100 ($1,275 (fair market value) less $175 sales proceeds). From the $1,100 figure petitioner subtracted $313.50, his small claims action recovery, [7] and the section 165(c)(3) $100 loss floor, to get a total deductible amount of $686.50 The evidence with respect to the car's 1973 basis is conflicting--as is the record with respect to the car's fair market value before and after the collision.A Kelley Blue Book for November-December 1973 is not competent evidence with respect to the car's January or August fair market value. There is included in the evidence *66 no credible independent appraisal of the car's value at any time in 1973. We need not resolve these issues, however, because we find that petitioner did not show by any competent evidence, (1) whether or not the car suffered any decrease in value due to this collision, or (2) if it had, the amount of the decrease in value for which he received no compensation. The final item of deduction with which we are concerned is a theft loss deduction for tools stolen from petitioner's garage. Petitioner claimed a deduction of $260, i.e., his estimate of the lost tools' full fair market value as of their probable loss date. The loss was insured, but was subject to a deductible amount of $250. Respondent allowed a deduction of $ 260.00
amount of loss
(100.00)
section 165(c)(3) floor
( 10.00)
amount covered by insurance and
for which a claim for recovery existed.
$ 150.00 Petitioner testified as his own witness with respect to some of the various events and values involved. He also had an expert witness who testified with respect to the value of petitioner's manuscript. OPINION Rule 142(a), Tax Court Rules of Practice and Procedure, places the burden of proof on petitioner with respect to the deficiency *67 alleged herein. Welch v. Helvering,290 U.S. 111, 115 (1933). The Ninth Circuit, to which an appeal in this case would normally go, points out that there are actually two "burdens" on a petitioner to the Tax Court: (1) the procedural "burden" imposed by the initial presumption in favor of respondent, and (2) the burden of persuasion which petitioner must carry to prove his case. Rockwell v. Commissioner,512 F.2d 882, 885 (9th Cir. 1975), rehearing denied June 13, 1975, cert. denied 423 U.S. 1015 (1975). The presumption in favor of respondent "is a procedural device which requires the taxpayer to come forward with enough evidence to support a finding contrary to the Commissioner's determination." Rockwell v. Commissioner,supra.After satisfying this "procedural burden", petitioner must still carry his ultimate burden of persuasion. "When as here, a taxpayer claims a deduction which is disallowed by the Internal Revenue Service, the burden is on the taxpayer to prove to the Tax Court the merit of the deduction." Rockwell v. Commissioner,supra512 F.2d at 886, quoting Nor-Cal Adjusters v. Commissioner,503 F.2d 359, 361 (9th Cir. 1974), affg. a Memorandum Opinion of this Court. *68 The burden is on petitioner not only to show that respondent is wrong, but also to produce evidence from which another and proper determination could be made. Lightsey v. Commissioner,63 F.2d 254, 255 (4th Cir. 1933). In attempting to carry this burden, petitioner's opinion with respect to the value of his own property is admissible, his lack of expertise in valuing property and his interest in the case go to his testimony's weight. Berkshire Mutual Insurance Company v. Moffett,378 F.2d 1007, 1011 (5th Cir. 1967); K. Redden and S. Saltzburg, Federal Rules of Evidence, Rule 701, p. 222 (1975). If we find that there was a charitable donation of property, or a casualty loss with respect to certain items of petitioner's property, but are not convinced by his evidence with respect to these items' values, we must estimate the amount thereof as best we can from the record. Cohan v. Commissioner,39 F.2d 540, 543, 544 (2nd Cir. 1930). The contested deductions fall into two groups: (1) those based on section 170, and (2) those based on section 165(a) and 165(c)(3). These groups will be taken in order. I In 1973 section 170 said, in relevant part: Sec. 170 (a) Allowance of Deduction.-- *69 (1) General Rule.--There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate. * * * (c) Charitable Contribution Defined.--For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of-- * * * (2) A corporation, trust, or community chest, fund, or foundation-- (A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States; (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals; (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and (D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including *70 the publishing or distributing of statements), any political campaign on behalf of any candidate for public office. * * * (e) Certain Contributions of Ordinary Income and Capital Gain Property.-- (1) General Rule.--The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by the sum of-- (A) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution) * * *. Thus, it is clear that in 1973 the Code provided for the deduction from gross income, in computing taxable income, of the value of any gift or contribution of property made within the taxable year to, or for the use of, certain described types of organizations (section 170(c)), within certain percentage limitations (section 170(b)). The value of a contribution of property other than money was defined in the regulations to be the "fair market value" of the property at the time of the contribution, reduced as provided in section 170(e)(1). Section 1.170A-1(c)(1), Income Tax Regs.[8] "Fair market value" was delimited by the regulations *71 as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Section 1.170A-1(c)(2), Income Tax Regs.
To show his entitlement to the deduction, it is incumbent on petitioner to prove by a preponderance of the evidence that the fair market value of the items donated to charity in 1973 was as he claimed and not as respondent determined, and that the gifts were made to section 170(c) organizations. Petitioner has failed to carry his burden. There are two categories of section 170 deductions here in issue, i.e., the gifts to Northrop, and the gifts to Goodwill and the Salvation Army (shown as items 4, 5 and 6 of Chart I). They shall be taken in order. (1) Northrop Donations. Petitioner took a deduction of $8,977 for his donation of 113 documents, including a photocopy of his manuscript, to Northrop--of which respondent allowed $1,600. The $8,977 figure consists of $5,085 for the manuscript, $2,000 for anticipated savings in other researchers' time in researching *72 the area, $300 attributable to the "cost of obtaining documents," and $1,592 for the donation of the other 112 documents. Respondent disallowed any amount attributable to the manuscript, and allowed $8.00 more than petitioner had originally claimed for the gift of the 112 remaining documents to Northrop. No part of the claimed deductions of $2,000 and $300 was allowed. A mere photocopy of petitioner's manuscript did not have a fair market value of $5,085 in 1973. Indeed, petitioner has failed to show that the photocopy had any fair market value as defined in section 1.170A-1(c)(2), Income Tax Regs., supra, when it was donated to Northrop. During trial petitioner's expert first testified that he thought the photocopy to have a value of $10,000 when it was donated. When the expert was informed by respondent's counsel that the gift was of a mere photocopy and did not include any rights such as publishing or copyright privileges, the expert revised this valuation down to $5,000. But then the expert qualified even this $5,000 figure by explaining that "I would hope that a buyer for $5,000.00 without a copyright would get [the author] to agree not to stop [the buyer] from securing *73 a copyright on a revised version of [the author's] work." Petitioner introduced no evidence to show that any such ancillary rights were given to Northrop with the photocpy. We cannot find on this record that the photocopy of petitioner's manuscript had any fair market value when donated to Northrop. Even if petitioner had donated the manuscript and all concomitant copyright privileges to Northrop instead of just a photocopy, and even if he could have then substantiated a "fair market value", as defined, for the manuscript, the gift would still not support a charitable donation deduction. The manuscript was not a capital asset. Section 1221(3)(A). It was thus "ordinary income property" for purposes of section 170(e)(1)(A) and section 1.170A-4(b)(1), Income Tax Regs.[9] Since petitioner had already deducted in previous years all those expenses of production which he could substantiate, had already received $2,000 in respect of the manuscript, and has not otherwise shown that he has any basis in the manuscript, it is clear that we cannot attribute any basis to the manuscript. We find that, at the time of its donation to Northrop, the manuscript had a zero basis. Cf. section 1.170A-1(c)(4), Income Tax Regs. *74 Thus all the gain on its sale or exchange would have been ordinary gain. The contribution of the manuscript to Northrop could not, therefore, generate a charitable deduction under section 170(e)(1)(A). The $2,000 item for anticipated savings to other researchers due to their use of petitioner's photocopy is too speculative to be allowed. Further, that element of the manuscript's value is includable in any value which the photocopy itself might have. We have found this figure to be zero. If the $2,000 figure was an attempted deduction by petitioner of the value of petitioner's own time spent researching, *75 it is still not allowable. Section 1.170A-1(g), Income Tax Regs. No evidence was offered with respect to the claimed deduction of $300 as a cost of obtaining documents. [10]
Failing the production by petitioner of any credible evidence upon which to base an allowance of the deduction, we must find that petitioner has failed to carry his burden on this issue. Thus we hold with respondent, and petitioner will be limited to a deduction of $1,600 with respect to the items donated to Northrop. (2) Goodwill and the Salvation Army. The deductions relating to the items donated to these two organizations can be taken together. Of the $2,083 combined deduction claimed for gifts to these organizations in 1973, respondent allowed $203. Petitioner estimated the date-of-donation value of these items himself. There was no concurrent appraisal thereof made by anyone else. The values petitioner has assigned to these gifts are *76 clearly exaggerated, to put it mildly. For example, petitioner deducted the original cost values of a 9 year old rug, there 3 year old garbage cans, and a 3 year old suitcase, all given to the Salvation Army. In no case did petitioner's estimate of the donated items' values, when given to charity, differ more than 50 percent from their original costs. Since petitioner's estimates are, therefore, not credible, we find that he has not carried his burden here and we find for respondent on this issue. II In 1973 section 165(a) provided in general, as it does today, that "any loss sustained during the taxable year and not compensated for by insurance or otherwise" is deductible. If the loss was suffered by an individual and was not incurred in a trade or business or in a transaction entered into for profit, the deduction of the loss was, and is, limited by section 165(c)(3) which reads: (c) Limitation on Losses of Individuals. -- In the case of an individual, the deduction under subsection (a) shall be limited to-- * * *
(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft.A loss described in *77 this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. * * * Section 1.165-7, Income Tax Regs., says, in material part: (a) * * * (2) Method of valuation. (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal. * * * (ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty. * * *
(b) Amount deductible. (1) General rule. In the case of any casualty loss whether or not incurred in a trade or business or in any transaction entered into for profit, the amount of loss to be taken into account for *78 the purposes of section 165(a) shall be the lesserof either-- (i) The amount which is dequal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or (ii) The amount of the adjusted basis prescribed in sec. 1.1011-1 for determining the loss from the sale or other disposition of the property involved. Thus the total deduction allowable under section 165(c)(3) is the difference between the fair market value of the property immediately before and immediately after the casualty, but not in excess of the item's adjusted basis at the time of the casualty. Section 1.165-7(b)(1), Income Tax Regs. The "cost of repairs" is acceptable evidence with respect to this loss in value. Section 1.165-7(a)(2)(ii), Income Tax Regs.
(1) Damage to House. Petitioner claimed a casualty loss in the amount of $2,838.36 for rainstorm damage to his home. A breakdown of this figure appears in Chart III above. Petitioner claimed $1,800 as the "estimated" cost of labor to repair the land failure on his property. The evidence indicates, and we have found, that this money was not expended in 1973. Petitioner introduced *79 no evidence with respect to the cost of repair of this land failure other than his own estimate which was made with reference to a 1975 edition booklet entitled the "National Construction Estimator." Petitioner's evidence in unreliable. Still, the order to comply which petitioner received in February 1974 indicates that some loss occurred and we have found that this loss did occur in 1973. From all the evidence we conclude that petitioner's gross loss was $1,000 with respect to the land failure. Cohan v. Commissioner,supra at 543-544. We include petitioner's expense of $57.47 [11] for repair of his retaining wall in this amount--from which amount the section 165(c)(3) $100 floor must be subtracted. Petitioner claimed other "repair" expenses in the amount of $1,085.87. He substantiated this claim with checks and receipts totaling $605.53 (Chart IV). Petitioner came forward with no evidence with respect to the $105.45 "other" loss, or with respect to the $182.06 "tile" loss. While petitioner showed his replacement costs with respect to the lost bedspread and rug, such *80 evidence is of minimal value in determining the dollar amount of the loss. Thus, the $66.78 "fabric" (i.e., bedspread) and $466.16 "rug" losses must also be held to be unsubstantiated. Even if the original costs of the lost items were equal to their replacement costs (a highly doubtful proposition in these inflationary times), their fair market value was almost certainly less than this basis when they were lost. Thus, we find no justification for allowing deductions for these items and would not feel comfortable applying Cohan v. Commissioner,supra.We have no evidence on which to challenge petitioner's averment that the bedspread and rug, for which a casualty deduction was sought, were not the same items donated to charity and also claimed as deductions. Applying the cost of repair test for measuring damages, we find that petitioner has supported claims for deductions under section 165(c)(3) for damage to his house in 1973 in the following additional amounts: (1) $13.60 for plumbing losses, and (2) $171.31 for plant replacement. Further we find that all the mudslide losses were due to one casualty in 1973. [12] *81 (2) Auto Collision. Petitioner claimed a pre-collision value of $1,275 for his car in 1973.We believe this estimate to be excessive. Petitioner received a total of $306.50 (small claims court judgment) plus $175 (sales price), or $481.50, on the car. From all the evidence we give petitioner's car a fair market value of $700 before the collision and, a value of $175 after the collision. We also find that petitioner's basis was in excess of $700 in 1973. Thus, petitioner's total loss in 1973 on the Lincoln was $218.50 from which the $100 section 165(c)(3) amount must be deducted. [13]
(3) Theft Loss. Any theft loss deduction must be reduced by any amount with respect to which there is a claim for reimbursement, on which there is a reasonable prospect of recovery. Section 165(a). Petitioner claimed a theft loss of $260.His insurance policy's deductible amount was $250. Thus his claim for reimbursement *82 was equal to $10. Respondent allowed the remaining $250 less the $100 section 165(c)(3) amount. Decision will be entered under Rule 155.
Footnotes
1. We note that of this $1,592 figure, $221 was attributable to a gift by petitioner of 10 photocopies of petitioner's doctoral thesis.↩
2. Apparently respondent rounded off the $1,592 claimed for the gift of the other 112 documents to $1,600.↩
3. CHART II
GIVEN TO GOODWILL INDUSTRIES (nonprofit, charitable) ↩
Date
Date
Price when
Current
contributed
purchased
new
value
8/21/73
1 GE Washing Machine
1964 $ 250
$ 150
1 GE Dryer, electric
1964
200
160
1 Frigidaire Dishwasher
1964
250
190
3 Suits, wood, size 42 @ $130
1971
390
200
1 Sport coat, Carrol's, wool
1970
150
100
@ $150
3 Toys (tricycle, bicycle,
1967
40
20
wagon)
4 Drapes
1966
200
150
5 Chairs, Herman Miller,
1967
150
100
plastics @ $30
1 Bedspread
1965
60
30
5 Misc. (2 vases, shoes, hat,
1968
45
25
clothes)
1 Child's coat
1970
20
10
5 Children's clothes
1971
50
25
1 Tennis shoes
1971
12
8
$ 1,168
GIVEN TO SALVATION ARMY (nonprofit, charitable)
11/23/73
3 Sports coats, Carrol's,
1970
450
297
wool @ $150
6 Sports shirts, cotton
1970
108
55
@ $18
1 Vacuum cleaner, Kirby
1971
250
150
1 Game, mechanical football
1968
10
5
1 Suitcase, tan
1970
35
35
1 Rug, Kariston [sic.],
1964
350
350
wool, orange, 9X12
3 Garbage cans, plastic
1970
18
18
1 Container, plastic
1970
5
5 $ 915
4. Our addition shows this figure to be $2,943.36. ↩
5. We assume that this $100 relates to sec. 165(c)(3).↩
6. ↩
Petitioner's estimated fair market value
$ 64,555
Estimated gross depreciation in value due to loss
(2,938)
Estimated post-casualty value
$ 61,617
7. Petitioner's recovery was actually $306.50. The excess $7.00 is attributable to petitioner's recovery of costs.↩
8. All references to regulations are to the appropriate regulation as it stood in 1973.↩
9. Sec. 1.170A-4(b)(1)↩ Ordinary income property. The term "ordinary income property" means property any portion of the gain on which would not have been long-term capital gain if the property had been sold by the donor at its fair market value at the time of its contribution to the charitable organization. Such term includes, for example, property held by the donor primarily for the sale to customers in the ordinary course of his trade or business, a work of art created by the donor, a manuscript prepared by the donor, letters and memorandums prepared by or for the donor * * *.
10. While petitioner introduced to evidence to show that Northrop was an organization described in sec. 170(c), respondent in effect conceded this issue by allowing petitioner a deduction under sec. 170↩ of $1,600 for his donation of the other 112 documents given to Northrop.
11. Petitioner's claim of $57.49 is unexplained.The check in payment for the expenses was in the amount of $57.47.↩
12. We note that petitioner's home was claimed to be used 60 percent for business purposes in 1973.
13. Petitioner's claim with respect tothe car which was used for business purposes was so variable that we cannot find any basis upon which to hold that any of the car was so used in 1973. Accordingly we cannot apply sec. 1.165-7(b)(4)(iv), Income Tax Regs.↩